Transportation Equipment Company, plaintiff, a partnership composed of Charles R. Robertson and Richard E. St. Pe, is engaged in the business of repairing automotive equipment, especially large trailers and trucks. Younger Bros., Inc., defendant, is a corporation engaged in the business of transporting petroleum products by tank trucks. Plaintiff partnership brought this suit against Younger Bros., Inc., alleging an indebtedness of $1689.06 as the balance due for the altering of one large trailer and the complete rebuilding of another tank trailer which had been badly damaged previously in a fire. Plaintiff alleges that the amount to which it is entitled for altering the axle on one trailer and rebuilding the other was $3,472.08; that Younger Bros., Inc., has paid on account $1783.02, and that, therefore, there is a balance due amounting to $1689.06, for which judgment is sought.
Defendant corporation admits that the partnership was employed to do the work on the two pieces of equipment, but maintains that in doing the alteration work on one of them there was an overcharge of $544, and that after the other piece of equipment — the tank trailer — had been rebuilt by plaintiff, a leak was discovered, and that in welding the trailer in an effort to repair the leak, it exploded through the carelessness of the employees of plaintiff and was a total loss. Defendant charges that plaintiff is responsible for the value of this tank trailer, $3500, and that, therefore, instead of being indebted to plaintiff, plaintiff is indebted to it in the sum of $2354.94 for which, as plaintiff in reconvention, it prays for judgment against the said partnership, Transportation Equipment Company. In other words, instead of admitting an indebtedness of $1689.06, defendant corporation claims that it owes a balance only of $1145.06 and that as a result of the destruction of its tank trailer, plaintiff owes it $3500, and that, therefore, deducting from this $3500 the balance of $1145.06, there is due to it $2354.94.
In the District Court there was judgment in favor of plaintiff in reconvention for $1704.94, which is $650 less than the amount claimed by plaintiff in reconvention, the $650 representing the salvage value of certain parts of the destroyed tank trailer.
From this judgment plaintiff partnership has appealed.
Though the suit is based on what at first glance seems to be a rather complicated accounting between the defendant corporation and the plaintiff partnership, the entire controversy grows out of two transactions — the altering of an axle on one trailer and the attempt to repair the leak in another, and the only questions in dispute are, first, whether there was an overcharge of $544 for the altering of the axle of the one trailer, and second, whether the plaintiff partnership is liable for the value of the tank trailer which exploded while in its shop undergoing repairs.
When the defendant, as plaintiff in reconvention, claimed that the plaintiff partnership should be held liable for the value of the trailer which was destroyed as the result of the explosion, plaintiff partnership filed a plea of prescription of one year. We shall not discuss that plea of prescription at this time for the reason that it is necessary to a complete understanding of the ground on which it is based that there be set forth all of the facts which preceded the explosion. We have decided that the plea should not be sustained and, therefore, will first discuss the facts which resulted in the explosion and then set forth our reasons for the overruling of the plea of prescription.
We shall refer to the two jobs which the plaintiff partnership was employed to perform as the "axle" job and the "tank" job.
The tank job was undertaken first. The defendant owned a large tank trailer which *Page 349 
had been damaged in a fire and which was taken to plaintiff to be completely rebuilt. The job was commenced during the middle of October, 1942. There is an irreconcilable dispute (which, under the conclusion we have reached, is unimportant) as to whether the work was completed on or about November 26, 1942, as plaintiff partnership maintains, or about December 20, 1942, as defendant corporation contends. At any rate, on the morning of December 24th, this trailer was sent back to the shop of plaintiff in order that a leak, which had been discovered, might be repaired.
The trailer had been used for the transporting of gasoline, and since, in repairing the leak, it was necessary to use a welding torch, it was important that proper precautions be taken to make certain that there remained in the tank neither gasoline nor explosive or combustible vapor. All parties agree that the proper method to be employed to make certain that such an operation is safe is to steam the tank, and the principal dispute arises over the question of whose duty it was to have this steaming done and whether the steaming was properly done, and whether, in spite of the steaming, the true cause of the explosion was carelessness on the part of employees of plaintiff partnership in not making certain that the operation could be undertaken.
Though there is a heated controversy over the time at which plaintiff was notified that the leak had been discovered and that defendant wished to have it repaired, we think that the record justifies the conclusion that on the morning of December 24th a representative of Younger Bros., Inc., defendant corporation, called plaintiff partnership and asked that the leak be fixed at once. We think, too, that during that or those conversations — for there may have been two of them — Younger Bros., Inc., were advised that the work could not be done on that day since it was Christmas Eve and all work in its shop would cease at noon. It appears, however, that since so small a welding job could have been done in a very short time, Younger Bros., Inc., were told that the only thing that would prevent the job being done on that morning was the absolute necessity that the tank be steamed before the welding could be attempted.
While there is a dispute over this question also, it seems to us that the record shows that the representative of Younger Bros., Inc., advised plaintiff that the steaming had been done. It may be that the fact is that the first conversation took place on the evening of the 23d and that it was at that time that Younger Bros., Inc., was advised that the work could be done on the next day if, in the meantime, the necessary steaming could be done.
It seems clear that if such a tank is steamed from eight to ten hours, there is no danger of such an explosion. That it was the intention of Younger Bros., Inc., that this trailer should be steamed for a sufficient time is shown by the fact that defendant knew that steaming costs about a dollar an hour and that the driver of the trailer, who was told to take it to the Cloverland Dairy Products Company for steaming, was given Ten Dollars in cash to be used in payment for that work. The steaming was done by the Cloverland Company, but the tank was steamed for only 1 1/2 hours, or probably for only 1 1/4 hours, as one of the witnesses says. The trailer reached the plant of plaintiff at about 10:30 o'clock or 11:00 o'clock on that morning, and the employees who were to do the welding were told by the driver that the steaming had been done. No tests were made by those employees, and a welding torch was applied to the outside of the tank and almost immediately the explosion occurred and the trailer was completely destroyed, except for the tires and certain parts, which were salvaged, and which had a value of $650.
The record shows that there are in existence and available now explosion meters which may be used to determine whether there remains in such a tank a sufficient accumulation of gasoline or gases to explode. But we think that the record also shows that at the time of this explosion such meters were not available, or at any rate, were not in general use.
Younger Bros., Inc., insists that the tank had been sent to the Cloverland Dairy Products Company for steaming at the suggestion *Page 350 
of plaintiff and that, therefore, if the steaming was improperly done, plaintiff should be held responsible, regardless of whether additional tests should have been made by plaintiff or not.
We do not think that the record justifies the conclusion that the Cloverland Dairy Products Company was selected by the plaintiff. We are convinced that the record shows that when plaintiff partnership stated, whether on the evening of December 23d, or on the morning of December 24th, that the work could not be done unless the steaming could be first completed, it merely suggested the names of two concerns which could do such steaming and one of these was the Cloverland Dairy Products Company. That company had steamed out innumerable tanks of various kinds, and it is shown that it would have applied the steam to this trailer for as long a time as the owners might have requested. It is shown, too, that Younger Bros., Inc., probably in New Orleans and certainly at other places, on many occasions had had trucks steamed out and were thoroughly familiar with the process and with the necessity therefor. This is further made evident by the fact that the driver, as we have stated, was given Ten Dollars to pay for the steaming at the rate of One Dollar an hour.
One very important fact is that although the driver in charge of the truck left the establishment of Younger Bros., Inc., in Kenner at about three o'clock, or certainly not later than four o'clock in the morning, he did not reach the plant of the Cloverland Dairy until some five or six hours later, and then asked that the trailer be steamed for 1 1/2 hours. This driver could not be produced as a witness, but it seems to us that the fact that the trailer was steamed for only 1 1/2 hours was due to his desire to go somewhere else during that intervening period of five or six hours, and that when he did not reach the plant of the Cloverland Company in time to have the steaming properly done, he undertook to give the order that the tank should be steamed only 1 1/2 hours.
An effort is made by Younger Bros., Inc., to show that plaintiff's employees should have known that the steam was applied for only 1 1/2 hours, and it attempted to prove that the receipt for the steaming, which would have shown this, was handed to the employee of plaintiff partnership before the operation commenced. The record overwhelmingly shows that when the tank reached the establishment of plaintiff partnership, the driver was asked whether the steaming had been done and he answered that it had, and it was only after the explosion that he produced the receipt showing that two compartments of the trailer had been steamed for only 1 1/2 hours.
We conclude that the fact is that Younger Bros., Inc., which was in the business of hauling gasoline and petroleum products, well knew the necessity of steaming out tanks and that they were well aware of the fact that such steaming operation to make the tank safe for welding would require from eight to ten hours.
[1, 2] We think, too, that the proximate cause of the explosion was the failure of Younger Brothers to see to it that the trailer was probably steamed before it was sent to the plant of plaintiff partnership. Under all the circumstances, the employees of plaintiff were justified in assuming that Younger Brothers — engaged in the business of transporting gasoline and quite familiar with the process of steaming out tanks — had had this done, and since the record shows that, had it been done, there would have been no danger of such an occurrence, it was not negligence on the part of those employees to undertake the welding on the outside of the tank.
We are well aware of the decision of our Supreme Court in Moore v. Jefferson Distilling Denaturing Co., 169 La. 1156,126 So. 691, in which that Court discussed the question of what was the proximate cause of an explosion of a steel drum which was supposed to be new but which obviously contained an alcoholic residue. The Court held that the negligence of the concern, which had furnished the drums, in failing to produce new drums and in furnishing drums in which an alcoholic residue was contained, was not the proximate cause of the ensuing explosion, but that the proximate cause was the intervening negligence of another person in holding a lighted match at the open bunghole of the drum. *Page 351 
[3] There, however, the act of the third person in holding the lighted match at the bunghole of the drum was a careless act which no one could have anticipated. Here it was well known that a welding torch was to be applied to the tank and, therefore, since the application of the torch was an act which all persons knew was bound to occur, those who should have made the tank safe against the effect of such an explosion were responsible for the results which were bound to occur if the steaming was not properly done.
In the Moore case the Supreme Court quoted with approval from its earlier decision in Globe Rutgers Fire Ins. Co. v. Standard Oil Co., 158 La. 763, 104 So. 707, in which the Court said [169 La. 1156, 126 So. 695]:
" '* * * One is bound to * * * provide against what usually happens and what is likely to happen; but it would impose too heavy a responsibility to hold him bound in like manner to guard against what is unusual and unlikely to happen, or what, as it is sometimes said, is only remotely and slightly probable.' * * *"
In the Globe Rutgers case it was charged that the cause of the fire was the negligence of an employee of the defendant who had permitted gasoline to run upon the ground adjacent to a store building. The Supreme Court held that that negligence was not the proximate cause of the ensuing fire which had resulted when a third person carelessly threw a lighted match upon the gasoline. The Court said that the intervening negligent act was the cause of the fire, since it was not an act which was to be expected by those who had carelessly allowed the gasoline to run upon the ground.
In the Moore case the Supreme Court distinguished between a situation such as it had found in the Globe Rutgers case and the situation in the Moore case, making the following statement:
"The casual and careless throwing of a match is an act much more usual, and hence to be expected, than is the deliberate applying of a lighted match to the bunghole of a steel drum, in an endeavor to show that the drum had never been used."
[4] Applying that reasoning to the facts of this case, we immediately see that since the act of the employees of plaintiff in applying the welding torch to the tank was an act which was not only to be expected, but was the operation for which the tank was sent to them, it follows that the cause of the accident was the failure of those who sent the tank to see to it that it was first properly prepared for such an operation.
The negligence of the employee of Younger Brothers was the cause of this disaster and it follows that plaintiff can not be held liable.
As we have already said, defendant, as plaintiff in reconvention, filed its reconventional demand on April 20, 1944, which was more than one year after the explosion which destroyed the trailer. Based on this fact, the defendant in reconvention, Transportation Equipment Company, filed a plea of prescription of one year, contending that the claim, on which the reconventional demand is based, is alleged to have resulted from a tort and that, therefore, the said claim became prescribed one year from the occurrence. Plaintiff in reconvention asserts that the claim in reconvention is based on an alleged breach of contract, and that although that breach is alleged to have resulted from negligence, nevertheless the demand grows out of a breach of contract and is, therefore, not prescribed in one year.
[5] It is well settled that where a contract is breached by negligence the party damaged may base his suit for the loss sustained either on the breach of contract or on the tort. In American Heating Plumbing Co. v. West End Country Club,171 La. 482, 131 So. 466, 469, the Supreme Court said:
"The rule is well settled that a party to a contract may have a money demand against the other party to a contract and may sue either on the tort or upon the contract at his option or election."
Relying upon this language, counsel for defendant in reconvention point to the allegations of the reconventional demand and assert that from those allegations it is *Page 352 
shown that Younger Brothers, plaintiff in reconvention, chose to base the reconventional demand solely on tort. Counsel show, for instance, that nowhere in the said demand is there an express charge that the contract to repair the tank was breached, and that, on the contrary, the loss is alleged to have been caused "solely and entirely by the negligence, lack of prudence and skill on the part of the plaintiff in proceeding to make the repairs and applying a welding torch and heat to the tank without first having made a complete examination and inspection of the said gasoline transport and without first having ascertained that it was safe to proceed with the repair work without causing damage or injury."
[6] We think that to adopt the interpretation which counsel place upon the decision of the Supreme Court in the American Heating case would be to place upon that language too narrow a construction. Careful reading of the decision indicates that what the Court held was that when a contract has been breached by negligence on the part of the contractor, if the facts alleged show that there was a contract and that, as a matter of fact, it was breached, then, in spite of the fact that the breach resulted from negligence, the prescription applicable is that of ten years and not that of one year.
In American Heating Plumbing Co. v. West End Country Club, supra, the Court said:
"The character of the action determines the prescription applicable thereto. If the action is purely one in tort, then it is prescribed by one year. If the action is predicated on a breach of the contract, then it is only prescribed by ten years."
We interpret that statement as meaning that where it is shown that there was a contract and that it was breached by reason of negligence on the part of the contractor, since the action based thereon is not "purely one in tort," it is not prescribed in one year. As the Supreme Court said in Illinois Cent. R. Co. v. New Orleans Terminal Co., 143 La. 467, 78 So. 738, 740.
"A contractor cannot liberate himself from his contract, or, in other words, destroy its obligation, by committing a tort; and if the obligation is not destroyed, but remains in full force, and the contract is breached, there is evidently a ground of action on the contract."
[7] The entire burden of the reconventional demand is that the defendant in reconvention has failed to carry out its contract, and however stoutly it may have been alleged that this failure was due to negligence, we think that, nevertheless, the claim is in reality based on a breach of contract and is, therefore, not prescribed in one year.
In the case of P. Oliver Sons v. Board of Commissioners,181 La. 802, 160 So. 419, 420, appears the following:
"It is said in Kohn v. Town of Carrollton, 10 La. Ann. 719, and confirmed in many subsequent cases, that the allegation by a plaintiff that he has been damaged does not determine that this action is ex delicto; for damages result as well from violation of contracts as from quasi offenses. The character of the action is determined from an examination of the whole petition."
As we have already stated, we conclude that the plea of prescription is not well founded.
We pass then to a consideration of the question of whether there was an overcharge for the altering of the axle of the other trailer. The charge as made amounted to $960.97, but defendant contends that the work was done under a contract which provided for a total payment of $350, and that this, with the addition of a small charge of $66.97, which is admittedly due for extras not included in the contract, is all that is due for the altering of this trailer; that deducting from the $960.97, charged for this work, the contract price, $350, and the amount due for extras shows that there was an overcharge of $544.
The sole question involved here is one of fact: Was the work done under a contract which provided for a fixed price of $350, as Younger Bros., Inc., maintains, or was it done without an agreed price on a quantum meruit basis as is contended by Transportation Equipment Company, the plaintiff partnership? *Page 353 
Plaintiff points out that from its books it appears that the actual cost of the work amounted to $956.50, of which $432 was expended for parts and material and $524.50 for labor, and it is argued that the members of the partnership had much experience in that kind of work and could not have made an estimate so completely out of line with the cost of doing the work.
When plaintiff agreed to do the work there was a trailer which had been brought to its establishment by two officials of Younger Bros., Inc. It is contended by plaintiff that this trailer, which was shown to one of the partners, was not the one which was later brought in for the alteration job; that the one which was shown to plaintiff had only a single axle of a lighter type and that the plaintiff understood that this was to be replaced by another single axle of a heavier type, but that when the trailer on which the work was done was brought in it proved to be a trailer with a double or dual axle, and to take off this axle and replace it with a single axle was a much more expensive job.
The officials of Younger Brothers maintain, on the contrary, that the actual trailer on which the work was to be done was brought to the establishment of plaintiff and that Mr. Robertson, one of the partners, saw the trailer and agreed to do the work for $350.
The testimony on this question can not be reconciled. Mr. Robertson said:
"Mr. Dale and Mr. Woodard were in the office one afternoon, and they had a trailer standing out in the yard, and they asked how much it would cost to remove that particular understructure and install a new axle under a trailer of that same type. We were supposed to use the brakes off of the job, and install it on the new axle. We looked at the unit and decided we could do it for about Three Hundred and Fifty Dollars ($350.00). When they sent the job in, they sent an entirely different type of unit from the one we discussed. They also authorized a considerable amount of additional work."
Mr. St. Pe, the other partner, said that when he saw the trailer which had been brought to plaintiff's establishment, he understood that it was that trailer on which the axle was to be changed; that that trailer had a light single axle which was to be replaced with another heavier one, but that when the trailer on which the actual change was to be made was sent in it had a double axle, which rendered the operation much more expensive.
On the other hand, the officials of Younger Brothers say that when the contract was made, the partners of plaintiff partnership were shown a double axle trailer and that they agreed to change that axle for a single one for $350. Mr. Woodard, the Louisiana Superintendent of Younger Brothers, said:
"We asked what he would charge us for all materials and labor to take out the tandem axle and replace it with a single axle. He told us it would be a flat $350.00."
He says, too, that after the work was in progress, he called at the shop of plaintiff and that even at that time Mr. Robertson said nothing to indicate that the job would cost more than the price which he says had been originally agreed upon. Later in his testimony, Mr. Woodard said that the job which Mr. Robertson had agreed to do for $350 was to "take out the old tandem axle and replace it with a single axle. * * *"
Dalas M. Dale, Vice-President of Younger Bros., Inc., says that the arrangements for the altering of the axle were made by Mr. Woodard and himself, on behalf of Younger Brothers, and Mr. Robertson, on behalf of the plaintiff partnership. In his testimony, he said:
"We discussed with Mr. Robertson removing the tandem axle and putting a single axle under the trailer, and told him that we had three units that we wanted the work done on and asked him what he would contract for, to remove the tandem axle and put on a single axle; and there was an agreed price of Three Hundred and Fifty Dollars ($350.00) per unit."
Later Mr. Dale was asked the following question:
"I believe, if I remember correctly, that you stated this morning that at the time the *Page 354 
estimate was given you, that the identical unit on which the axle was to be changed was at that time in the shop. Did you say that?" He answered: "Yes, sir."
There are circumstances corroborative of the contentions of both parties. For instance, the entire cost of the job, as actually done, when compared with the alleged contract price would indicate either that the plaintiff partnership was not shown the actual trailer on which the work was to be done, or that the plaintiff was most care-so-less in preparing its bid for the work. Then, too, it seems clear that the protest about the alleged overcharge was not made until long after the work had been done and the bill sent, and, in fact, not until the plaintiff partnership had requested payment for this and other bills. On the other hand, it is most probable that if some other type of equipment had been sent in to plaintiff and a price for the conversion on that other type of equipment had been made, the members of plaintiff partnership would have protested when the equipment, which was actually sent in to be converted, proved to be entirely different from that which they had been shown.
[8] Were it not for the fact that on this question of fact we have the benefit of the finding of the District Court, it would be most difficult to reach a conclusion. However, the District Judge saw and heard the witnesses who testified before him at great length and reached the conclusion that a fixed contract price had been agreed upon. From the record before us we can not say that this finding was obviously erroneous. We, therefore, conclude that the finding of the District judge on this question should not be disturbed.
Accordingly, we conclude that the plaintiff partnership was entitled to only $350, the contract price, and to $66.97 for extras. It thus appears that from the balance, which is claimed to be due, $1689.06, there should be deducted $544, the amount of the overcharge, and that plaintiff partnership should have judgment against defendant corporation for $1145.06.
It is, therefore, ordered, adjudged and decreed that the judgment appealed from be and it is annulled, avoided and reversed, and that there now be judgment in favor of plaintiff and against defendant in the full sum of $1145.06, with legal interest from judicial demand, and that the reconventional demand be and it is dismissed at the cost of defendant and plaintiff in reconvention; defendant to pay all costs.
Reversed.